[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-14254
Non-Argument Calendar

_____

D.C. Docket No. 3:14-cv-00027-JRK

GARY D. PENNINGTON,

Plaintiff-Appellant,

versus

COMMISSIONER OF SOCIAL SECURITY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(June 17, 2016)

Before WILSON, ROSENBAUM and FAY, Circuit Judges.

PER CURIAM:

Gary D. Pennington appeals the district judge's affirming the Social Security Administration's denial of his application for Social Security income ("SSI"), 42 U.S.C. § 1383(c)(1), (3).  We affirm.

## I.  BACKGROUND

Pennington filed an application for SSI on February 1, 2010, and alleged a disability onset date of January 2, 2006.  He maintained he was disabled because of back problems and cuts to two fingers on his left hand.  His application was denied initially and upon reconsideration.  Through counsel, Pennington requested and was granted an administrative hearing before an administrative law judge ("ALJ").

## A.    Documentary Evidence

### 1.    Medical Records

In January 2001, Pennington, a resident of Bunnell, Florida, was transported to the emergency room at Memorial Hospital in Orlando, after being struck in the right eye with a nail.  The Veterans Administration ("VA") medical records show Pennington received follow-up care for this eye injury several times between January and March 2001 and came to the VA with another eye injury in February 2002.  On July 2, 2002, Pennington presented to the emergency room at Memorial Hospital and complained of cramping in his hands.  The x-rays taken on the same date showed osteoarthritis of several joints in Pennington's right hand.

2

In July 2003, Pennington was treated at Halifax Medical Center in Daytona Beach for a laceration to his left-middle finger, which partially lacerated a tendon in the finger.  Pennington returned to Halifax Medical Center in October 2003 with a laceration to his left-ring finger, which tore one of his tendons.  On both occasions, Dr. Richard Tessler, Pennington's treating physician, was able to repair the wound.

On February 8, 2010, Pennington was seen by Dr. Shrimani Reddy at the VA in Daytona Beach outpatient clinic.  Dr. Reddy's notes show Pennington was a new patient and had stated he was not seeing any doctors outside of the VA. Pennington presented with chronic lower back, hand, and knee pain as well as muscle spasms.  Dr. Reddy assessed Pennington with chronic low-back pain/arthralgias and muscle spasms; he prescribed naproxen and methocarbamol. Dr. Reddy also noted Pennington was experiencing stress secondary to his financial situation and   ordered x-rays of Pennington's spine and right hand.  The x-rays revealed severe degenerative disc disease and osteophytosis of the lower thoracic and upper lumbar spine as well as degenerative changes involving the base of the thumb and interphalangeal joints that were suggestive of inflammatory osteoarthritis.

In April 2010, Pennington was referred for and received an eye exam.  He had scar tissue on his right eye from his previous nail injury, and his vision in that

3

eye was not correctible to 20/20 because of the scarring.  Pennington received a new prescription and was issued a new pair of glasses.

In progress notes dated August 12, 2010, Dr. Paul Blackwood at the VA stated Pennington's lungs showed signs of emphysema and recommended a pulmonary-function test.  Dr. Blackwood further noted Pennington stated he had a hernia in his abdomen, but it was not painful; he had experienced occasional chest pain from stress; and he experienced shortness of breath upon exertion.  In addition, Pennington had multiple-joint-degenerative disorder.  Pennington's physical exam showed he had full range of motion in his back and tenderness in his lower-lumbar spine.  Dr. Blackwood noted Pennington was willing to have surgery for his hernia, if needed, but stated surgery should be deferred until Pennington received a cardiac evaluation.  A radiology report dated August 12, 2010, showed imaging was taken of Pennington's chest to evaluate him for emphysema.  The test revealed mild diffuse interstitial changes in both lungs, which was consistent with chronic-obstructive-pulmonary disease ("COPD").

Dr. Blackwood's progress notes dated November 3, 2010, state Pennington had complained of occasional chest pain and shortness of breath; Dr. Blackwood diagnosed Pennington with COPD.  At the November 3, 2010, visit, Pennington rated the pain in his hands and lower back as a four out of ten, described the pain as chronic, and stated he had been experiencing pain since 1983.  Pennington

4

further stated his pain was usually four out of ten and affected his ability to sleep and engage in physical activity. He stated the pain was triggered by lifting but was at least partially relieved by medication.

VA records further showed Dr. Blackwood referred Pennington for a cardiology-diagnostic procedure, but Pennington did not appear for his scheduled stress test in November 2010. Dr. Blackwood also referred Pennington for a pulmonary-function test, but Pennington did not appear for his scheduled appointment in January 2011. Likewise, Pennington was referred for a physical-therapy consultation, scheduled for March 2011, but he did not appear for the appointment. The records also showed Dr. Blackwood had prescribed Pennington methocarbamol and naproxen for pain. In a letter dated June 28, 2011, Dr. Blackwood informed Pennington he was unable to complete a Social Security Questionnaire for him, because he was not allowed to complete such physical evaluations.

Pennington underwent a cardiac-stress test on March 23, 2012. He stated he had experienced tightness in his chest, dyspnea, and back pain during the test. At the test, Pennington experienced occasional premature atrial contractions but no sustained arrhythmias. The progress notes showed Pennington's test was abnormal and suggestive of ischemia; consequently, Pennington was referred for a cardiac-

5

catheterization procedure. Pennington was instructed to avoid strenuous physical activity.

### 2. Consultative Examinations and Residual Functional Capacity Assessments

Dr. David Carpenter of Ormond Medical Arts Family Practice performed a consultative exam on May 4, 2010. Pennington reported a long history of chronic lower back, left knee, and hand pain but denied any particular injury or trauma as the cause of his symptoms. Pennington told Dr. Carpenter his lower-back pain was exacerbated by prolonged sitting, standing, walking, and activity, and his hand pain was exacerbated by activity. Pennington also reported weakness and poor grip strength in his hands but stated he was capable of performing daily activities without assistance. Dr. Carpenter noted Pennington had decreased sensation to a pinprick, light touch throughout both hands, and generalized point tenderness throughout all digits of both hands. Pennington also had degenerative changes throughout the joints of both hands and clubbing of the digits bilaterally. Pennington's grip strength was a 5/5 bilaterally, his fine manipulation skills were intact, and he had no difficulty manipulating buttons or opening doors. Dr. Carpenter concluded Pennington suffered from osteoarthritis with chronic-bilateral hand, low back, and left-knee pain and stated Pennington might have difficulty performing work-related tasks involving sitting, standing, ambulation, lifting, carrying, and fine manipulation.

6

Sabrina Lichtward, a medical disability adjudicator, performed a residual functional capacity ("RFC") assessment on May 19, 2010. Lichtward determined Pennington (1) could occasionally lift or carry up to 20 pounds and frequently lift or carry up to 10 pounds, (2) could stand or walk for a total of 6 hours in a work day, (3) could sit for a total of 6 hours, (4) was unlimited in his ability to push or pull, (5) could frequently climb ramps and stairs, balance, kneel, crouch, and crawl, (6) could occasionally climb ladders, ropes, and scaffolds, and stoop, and (7) had no manipulative limitations. Lichtward concluded Pennington's reported symptoms were attributable to a medically determinable impairment, and the severity of his symptoms and their alleged effect on his functioning were fairly consistent with the medical and nonmedical evidence. She further stated Pennington seemed mostly credible. Lichtward noted, however, Dr. Carpenter's conclusion concerning Pennington's possible limitations was somewhat contradictory to the findings in his report.

Dr. Reuben Brigety, a medical consultant, completed an RFC assessment on November 2, 2010. Dr. Brigety agreed with Lichtward's assessment of Pennington's exertional limitations but concluded Pennington only occasionally could climb ramps, stairs, ladders, ropes, and scaffolds, and occasionally could balance, stoop, kneel, crouch, and crawl. He further determined Pennington was

7

unlimited in reaching, gross manipulation, and fine manipulation but was limited in his ability to feel.  Dr. Brigety noted Pennington was credible.

Dr. Charles Kollmer of New Smyrna Orthopedics conducted a consultative examination on Pennington on November 22, 2011, and completed a RFC questionnaire.  Dr. Kollmer listed Pennington's diagnoses as (1) cervical strain with degenerative disc disease, (2) lumbosacral strain with degenerative disc disease, and (3) carpo-metacarpal joint degenerative joint disease of the bilateral hands.  Dr. Kollmer noted Pennington stated his pain was constant and rated it as four to six out of ten.  Dr. Kollmer opined Pennington had decreased range of motion in the cervical spine, spasms of the cervical and lumbar spine, and increased crepitation and grinding of the bilateral carpo-metacarpal joints; his response to medication was poor.  Dr. Kollmer noted Pennington's anxiety affected his physical condition and stated Pennington's impairments were reasonably consistent with his symptoms and functional limitations.  Dr. Kollmer stated Pennington's pain would frequently interfere with his work performance.  He also noted Pennington was capable only of a low-stress job; he explained Pennington "was able to perform duties at Home Depot for several weeks [and] also worked for the cable company, but found these jobs too stressful."  R. at 515.

Dr. Kollmer concluded Pennington could sit or stand for only twenty minutes at a time, could sit for a maximum of four hours during a work day, and

stand for a maximum of two hours; he must be allowed to walk around for five minutes of every hour during the work day.  In addition, Pennington required a job that would allow him to sit or stand at will, and he would need to take ten-minute breaks every two hours.  Dr. Kollmer further stated Pennington could (1) frequently lift less than 10 pounds and climb stairs, (2) occasionally lift 10 to 20 pounds, twist, bend, stoop, crouch, squat, and climb ladders, and (3) rarely lift 50 pounds.  Dr. Kollmer further opined Pennington had significant limitations with reaching, handling, and fingering, and stated his ability to grasp, turn, and twist objects was limited.

### 3.    Other Evidence

Pennington's earnings records showed earnings for the years 1979-1986, 1988-1990, 1993-1998, and 2001-2002.  In no year did Pennington's earnings exceed $16,000, and in eight of the eighteen years for which Pennington had covered earnings during all four quarters, his earnings did not exceed $6,500.  In a pain questionnaire dated March 29, 2010, Pennington stated he had pain all day every day and was taking naproxen and methocarbamol to relieve his pain.  He said he had no side effects from this medication and had not tried any other forms of therapy or treatment to relieve his pain.  Pennington stated he needed help from his girlfriend to perform some daily activities and needed to take breaks when

9

doing yard work. He stated that standing, sitting, and walking all caused pain and pressure in his back, ranging from five out of ten to eight of ten in severity.

## B.    Hearing Testimony

At the February 2012 hearing before the ALJ, Pennington testified he had a GED, a driver's license, and drove two or three times a week as needed to go to the grocery store or to look for work. The ALJ asked Pennington whether something happened on January 2, 2006, his alleged onset date, that caused him to become unable to work. Pennington explained he could not perform the duties he previously was able to perform, because of breathing problems and an injury to his back. The ALJ asked whether Pennington injured his back on the alleged onset date; Pennington responded he injured his back doing physical labor, and the injury had been ongoing. He stated he had been diagnosed with degenerative disc disease, but could not recall when he received that diagnosis and stated the date would be in his medical records.

Pennington explained he previously had worked as an electrician and a carpenter, but no longer could perform the physical duties necessary for that type of work. Since filing his application for SSI, Pennington had worked at Home Depot for 89 days, and at a cable company but was unable to perform the duties required for each job. At Home Depot, he was hired to assist in stocking merchandise but was unable to perform the work because of his hands, back, and

hernia.  At the cable company, he was unable to keep up with the demands of the job because of his back problems and arthritis in his hands.  Because he physically could not perform the duties required, Pennington was terminated from both jobs.

Pennington testified he did work around the property on which he lived, but had to pace himself in performing household chores and personal-care activities. The ALJ asked Pennington to describe his activities the previous day.  Pennington stated he woke up and got ready, drove to his attorney's office, stopped by the post office and a restaurant on the way home, fed his dogs, napped for about two hours, cooked dinner, and watched TV.  Pennington stated that was a fairly typical day for him.

Pennington stated he was taking methocarbamol for muscle pain and had been proscribed several other medications by Dr. Blackwood at the VA.  He acknowledged Dr. Blackwood had never told him he was unable to work or that he needed to limit his activities in any way.  Pennington further testified he had a hernia, which caused swelling, discomfort, and stomach irritation; he was waiting on the VA to schedule his hernia surgery.  He stated he had pain in his lower back, which he rated as a seven or eight out of ten without medication.  Pennington took pain medication on a daily basis, which reduced his pain to two to four out of ten. The medication, however, caused drowsiness and an upset stomach; Pennington stated he typically took naps daily for fatigue and stress.  He also experienced

numbness and tingling in his legs, when he engaged in physical activity, and he had difficulty gripping and performing other fine-motor tasks with his hands, because of his arthritis. Pennington stated he was afraid he might have a stroke, because he had experienced chest pains, had vision problems from previous injuries to his eyes, and had limited hearing in his left ear. In addition, Pennington had been prescribed an inhaler because he experienced shortness of breath, when he engaged in physical activity. The breathing problems required him to take breaks every half hour when performing physical activities and interfered with his ability to sleep at night. Pennington explained he could sit only for an hour at a time, because of his back pain but stated he frequently could lift his smallest dog, that weighed 18 pounds.

The ALJ asked the vocational expert ("VE") whether work existed in the national economy for a person who was (1) a younger individual with a GED but no relevant past work, (2) restricted to light work with no more than occasional bilateral feeling, climbing of ramps, stairs, ladders, ropes, and scaffolds, balancing, stooping, kneeling, crouching, and crawling, and (3) could not have concentrated exposure to hazards, dangerous machinery, heights, or pulmonary irritants. The VE testified such a person could work as a ticket taker, office helper, or a cleaner in housekeeping. The ALJ asked whether those jobs would be available if the hypothetical person also required an option to sit or stand at will. The VE stated

12

the office helper and ticket-taker jobs would satisfy that requirement, and such a person also could work as an assembler of plastic-hospital parts. Pennington's counsel asked whether the jobs the VE mentioned required the ability to carry out fine manipulation tasks; the VE stated the ticket taker and housekeeping jobs did not have that requirement.

## C.    ALJ Determination

The ALJ determined Pennington did not have a disability within the meaning of the Social Security Act. Although Pennington had worked at Home Depot and the cable company since filing his SSI application, the ALJ concluded that work did not rise to the level of substantial gainful activity. Concerning Pennington's claimed impairments, the ALJ noted Pennington had vision issues but stated Pennington continued to drive and admitted he was able to see with glasses. Similarly, the ALJ concluded Pennington's possible coronary-artery disease did not rise to the level of a severe impairment, because his stress test was inconclusive; he had not submitted additional records; and there were no limitations from his coronary-artery disease, which that had persisted for a consecutive twelve-month period. The ALJ also noted Pennington had not followed up or scheduled any surgery to repair his hernia since he was seen in 2010. In addition, regarding Pennington's assertion he suffered from stress and

13

anxiety, the record contained no medical evidence showing a diagnosis of those conditions or any mental-health treatment.

The ALJ concluded, however, Pennington had the following severe impairments: disorders of the spine, right-thumb osteoarthritis, and COPD. Despite these severe impairments, the ALJ concluded Pennington did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments ("the Listings") in 20 CFR Part 404, Subpart P, Appendix 1.

The ALJ determined Pennington had the RFC to perform light work with the following limitations: (1) the ability to change position between sitting and standing at will, (2) no more than occasional bilateral feeling, climbing of ramps, stairs, ladders, ropes, or scaffolds, balancing, kneeling, stooping, crouching, and crawling, and (3) no concentrated exposure to hazards, dangerous machinery, heights, or pulmonary irritants including dusts, fumes, odors, and gases. In making this determination, the ALJ considered Pennington's symptoms, the extent to which they were consistent with the objective-medical evidence, and the opinion evidence presented. After summarizing the medical evidence and hearing testimony, the ALJ concluded Pennington's medically determinable impairments reasonably could be expected to cause his alleged symptoms. Nevertheless, the ALJ found Pennington's statements concerning the intensity, persistence, and

limiting effect of his symptoms were not credible to the extent they were inconsistent with the ALJ's RFC determination.

First, the ALJ noted Pennington's alleged onset date of January 2006 was not corroborated by medical evidence, and Pennington had provided vague and inconsistent testimony about why he had stopped working. Specifically, Pennington at one time reported he had stopped working at Home Depot and the cable company because of stress; at the hearing, however, he testified he was terminated from both jobs because he could not keep up with the physical demands of the work. The ALJ further found Pennington had a tendency to exaggerate, because he told Dr. Carpenter he suffered from poor grip strength and weakness in his hands, but was assessed by Dr. Carpenter as having 5/5 bilateral grip strength. In addition, Dr. Carpenter reported Pennington's fine-manipulation skills were intact, and Pennington had no difficulty manipulating buttons or opening doors.

The ALJ further stated Pennington's poor work history, which did not include any real relevant past work, did not enhance his credibility and was suggestive of secondary-motivational issues. Furthermore, Pennington's daily activities showed he was capable of performing light work, since he was able to care for his dogs, perform some yard work, and do some housekeeping. The ALJ also noted Pennington's treatment had been conservative, consisting primarily of a medication regimen that essentially had remained unchanged with no significant

side effects.  Finally, although Pennington saw Dr. Kollmer for a one-time evaluation, he did not follow up with Dr. Kollmer for additional treatment, and the record did not contain any recommendation for injections or surgery.

Regarding the medical-opinion evidence, the ALJ noted there were no opinions from any treating provider regarding functional limitations or disability, and Dr. Blackwood "was unwilling to assess any limitations."  R. at 61.  The ALJ gave significant weight to Dr. Brigety's opinion and assessed additional limitations based on Pennington's partially credible testimony concerning the need to limit his exposure to pulmonary irritants because of shortness of breath.  The ALJ gave no weight to Dr. Kollmer's opinion, because it was not well supported by Pennington's treatment records.  The ALJ noted Dr. Kollmer was a non-treating, one-time examining physician.  The ALJ explained Dr. Kollmer's assessment was inconsistent with Dr. Carpenter's finding Pennington had normal range of motion of the cervical spine, and the treatment records showed no subsequent exacerbation.  The ALJ also reiterated Pennington's statement to Dr. Kollmer, that he had stopped working because of stress, was inconsistent with his hearing testimony.  Accordingly, the ALJ concluded the RFC assessment was consistent with the overall credible record evidence.

The ALJ found Pennington had no past relevant work but had at least a high-school education and was able to communicate in English.  The ALJ noted

16

Pennington was 48 years old when he filed his application, which placed him in the "younger individual" age category of 18 to 49 years, but he had since moved into the "closely approaching advanced age" category. Considering Pennington's age, education, work experience, and RFC, the ALJ concluded Pennington could adjust to other work that existed in significant numbers in the national economy. Specifically, based on the VE's testimony, the ALJ found Pennington could perform the jobs of ticket taker, office helper, and assembler of plastic-hospital parts. Therefore, the ALJ concluded Pennington was not disabled and denied his application for SSI.

## D.    Subsequent Proceedings

The Appeals Council denied Pennington's request for review of the ALJ's decision. Pennington then filed a complaint for review in federal district court and consented to proceed before a magistrate judge. The magistrate judge affirmed the Commissioner's final decision.

## II.  DISCUSSION

## A.    Credibility Finding and ALJ's Duty to Develop the Record

On appeal, Pennington first argues the medical evidence supported his claims concerning the limiting effects of his pain, and the ALJ's reasons for disregarding his subjective complaints were not based on substantial evidence. Pennington further asserts the ALJ failed to fully and fairly develop the record

17

concerning gaps in his medical and work history and the reasons for his conservative course of treatment.

We review an ALJ's decision for substantial evidence and the ALJ's application of legal principles de novo. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (citation and internal quotation marks omitted). We may not decide the facts anew, make credibility determinations, or re-weigh the evidence. *Moore*, 405 F.3d at 1211. Credibility determinations "are the province of the ALJ," and we will not disturb a clearly articulated credibility finding supported by substantial evidence. *Mitchell v. Comm'r of Soc. Sec.*, 771 F.3d 780, 782 (11th Cir. 2014). If the ALJ discredits the claimant's subjective testimony, the ALJ must state explicit and adequate reasons for doing so. *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002).

Eligibility for SSI requires the claimant to be under a disability. 42 U.S.C. § 1382(a)(1)-(2). In relevant part, a claimant is under a disability if he is unable to engage in substantial gainful activity by reason of a medically determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C.

18

§ 1382c(a)(3)(A).  In evaluating SSI claims, the ALJ uses a five-step, sequential evaluation process to determine whether a claimant is disabled.  20 C.F.R. § 416.920(a).  As part of this process, the ALJ analyzes whether the claimant (1) is currently engaged in substantial gainful activity, (2) has a severe, medically determinable impairment or combination of impairments, (3) has an impairment, or combination thereof, that meets or equals the severity of a Listing, (4) can perform any of his past relevant work, in view of his RFC, and (5) can make an adjustment to other work relative to his RFC, age, education, and work experience.  *See id.*

Whether or not a claimant is represented by counsel, the ALJ has a duty to develop a full and fair record.  *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003).  This duty is heightened when the claimant is not represented by counsel in the administrative proceeding.  *See Brown v. Shalala*, 44 F.3d 931, 934-35 (11th Cir. 1995); *Kelley v. Heckler*, 761 F.2d 1538, 1540 & n.2 (11th Cir. 1985).  Nevertheless, the claimant ultimately bears the burden of proving he is disabled and consequently is responsible for producing evidence in support of his claim.  *Ellison*, 355 F.3d at 1276.  In determining whether a remand is necessary to develop the record, we consider whether there are evidentiary gaps in the record that result in unfairness or clear prejudice to the claimant.  *Brown*, 44 F.3d at 935.  Therefore, a claimant must demonstrate prejudice before we will conclude his due process rights have been violated to such an extent that the case must be remanded.

19

*Id.* To demonstrate prejudice, the claimant must show "the ALJ did not have all of the relevant evidence before him in the record . . ., or that the ALJ did not consider all of the evidence in the record in reaching his decision." *Kelley*, 761 F.2d at 1540.

Substantial evidence supports the ALJ's finding Pennington's testimony concerning his alleged onset date was not credible. *See Mitchell*, 771 F.3d at 782. In his application, Pennington identified January 2, 2006, as his alleged onset date. At the hearing before the ALJ, however, Pennington was unable to state specifically why or how he became unable to work on that day. Similarly, during his consultative exam with Dr. Carpenter, Pennington could not identify any discrete injury as the cause of his symptoms and merely stated he had a long history of chronic pain. In addition, Pennington told Dr. Blackwood he had been experiencing chronic pain since 1983, which was well before the alleged onset date.

Pennington contends the ALJ should have inquired about the gap in his medical records between 2003 and 2010 before discrediting his testimony, based on the lack of evidence to support his alleged onset date of January 2006. Pennington, however, does not assert any medical records actually exist for the period from 2003 to 2010 or explain how such records would be relevant to support his alleged onset date. Consequently, he has not demonstrated any

20

prejudice from the ALJ's alleged failure to develop the record regarding the gap in his medical history. *See Kelley*, 761 F.2d at 1540 (holding, to show prejudice, the claimant must show "the ALJ did not have all of the *relevant* evidence before him in the record") (emphasis added)). In addition, the VA records from February 8, 2010, showed Pennington was a new patient and had not been seeing any other doctor, suggesting the gap in his medical records simply reflects a period during which he did not seek medical treatment. This suggestion is further supported by the absence of any indication from Pennington or his counsel that such records exist. Furthermore, Pennington ultimately bore the burden of producing evidence to support his claim of disability; because he was represented by counsel in the administrative proceeding, the ALJ was not subject to the heightened duty to develop the record that applies in proceedings involving unrepresented claimants. *See Ellison*, 355 F.3d at 1276; *Brown*, 44 F.3d at 934-35; *Kelley*, 761 F.2d at 1540 & n.2.

Substantial evidence also supports the ALJ's conclusion Pennington exaggerated his limitations concerning his ability to use his hands. Despite Pennington's own reports of weakness and poor grip strength in his hands, Dr. Carpenter found Pennington had 5/5 grip strength bilaterally, intact fine-manipulation skills, and was able to manipulate buttons and open doors without difficulty. Dr. Carpenter did opine Pennington might have difficulty performing

fine-manipulation tasks. In a RFC assessment completed a few weeks after Pennington had seen Dr. Carpenter, Lichtward, the medical disability adjudicator, noted such a conclusion somewhat contradicted Dr. Carpenter's medical findings. Additionally, both Lichtward and Dr. Brigety, who completed an RFC assessment on November 2, 2010, determined Pennington was unlimited in his ability to perform gross and fine-manipulation tasks; in that regard, Dr. Brigety noted limitations only in Pennington's ability to feel. Consequently, there was more than a scintilla of evidence to support the ALJ's conclusion Pennington's symptoms were not consistent with the medical evidence. *Winschel*, 631 F.3d at 1178.

The evidence also supports the ALJ's conclusion Pennington had a poor work history reflective of possible secondary-motivational issues. Pennington's earning records revealed gaps in his work history in 1987, 1991 to 1992, and 1999 to 2000, and showed no work history after 2002. Additionally, Pennington's earnings in the years he did work were below what a person working full time at the then-prevailing minimum wage would have earned, which suggested he did not work full time consistently. Pennington contends the ALJ should have questioned him about the gaps in his work history before concluding those gaps reflected secondary-motivational issues; he suggests there might have been credible explanations for those gaps. But Pennington does not actually offer such explanation or supporting evidence; therefore, he cannot show any relevant

22

evidence concerning his work history was missing from the record. *See Kelley*, 761 F.2d at 1540. Consequently, he has not shown prejudice from the ALJ's alleged failure to develop the record concerning his work history. *See Brown*, 44 F.3d at 935; *Kelley*, 761 F.2d at 1540.

Additionally, the evidence supports the ALJ's conclusion that Pennington's activities of daily life showed a capacity for light work. Although Pennington testified he had to pace himself when doing work around the house, he also testified he was able to cook, care for his dogs, do some household chores, and work around the property on which he lives. While Pennington stated in his March 29, 2010, pain questionnaire he needed help from his girlfriend to perform some daily activities, he told Dr. Carpenter on May 4, 2010, he was able to perform daily activities without assistance. These contradictory statements provide an additional basis of support for the ALJ's conclusion Pennington was exaggerating his functional limitations. Moreover, an ALJ properly may rely on a claimant's daily activities in making credibility determinations. *See, e.g.*, *Moore*, 405 F.3d at 1212-13.

Finally, Pennington contests the ALJ's reliance on his conservative treatment as a basis for discrediting his testimony concerning the severity of his symptoms and contends the ALJ impermissibly made an independent medical determination. He asserts the ALJ failed to develop the record by not questioning

23

him about his course of treatment and posits his doctors may have been waiting for the results of his cardiac catheterization and pulmonary-function tests before suggesting more aggressive treatment.  Like his previous failure-to-develop arguments, Pennington does not demonstrate prejudice, because he does not actually assert or provide evidence there was a reason for his conservative treatment unrelated to the severity of his symptoms or that further development of the record by the ALJ would have revealed that evidence.  *See Brown*, 44 F.3d at 935; *Kelley*, 761 F.2d at 1540.

The ALJ was correct in noting none of the medical records included recommendations for more aggressive treatment for Pennington's back and hand pain.  In relying on this fact, the ALJ did not impermissibly make an independent medical determination, because ALJs are permitted to consider the type of treatment a claimant received in assessing the credibility of his subjective complaints.  *See* 20 C.F.R. § 416.929(c)(3)(iv), (v).  Moreover, Pennington's testimony at the hearing concerning the side effects of his medications was undermined by his statement on his pain questionnaire he was not suffering any side effects from his medication.  In addition, Pennington testified the medication reduced his pain from seven or eight out of ten to two to four out of ten; he also told Dr. Blackwood his pain was partially relieved by medication, which suggested his treatment was conservative, because his symptoms were being managed

24

adequately.  Consequently, there was more than a scintilla of evidence to support the ALJ's conclusion Pennington's conservative treatment undermined his testimony about the severity of his symptoms.  *Winschel*, 631 F.3d at 1178

In summary, the ALJ clearly stated explicit and adequate reasons for her credibility determination, and those reasons were supported by substantial evidence.  *Mitchell*, 771 F.3d at 782; *Wilson*, 284 F.3d at 1225.  Furthermore, the ALJ did not fail to fully and fairly develop the record; Pennington failed to demonstrate prejudice from this alleged failure.  *Brown*, 44 F.3d at 935; *Kelley*, 761 F.2d at 1540.

**B.    ALJ's Hypothetical to the VE**

Pennington also argues the VE's testimony does not constitute substantial evidence in support of the ALJ's finding he could perform other work, because the ALJ did not include all of his limitations in the hypotheticals posed to the VE.  Specifically, Pennington contends the ALJ erred in failing to include limitations in fine manipulation skills, because the medical evidence supported his complaints about his hands.

We review the ALJ's decision for substantial evidence.  *Moore*, 405 F.3d at 1211.  In a disability determination, once a claimant demonstrates he no longer can perform his past relevant work, the burden shifts to the ALJ to show the claimant can perform other jobs in the national economy, despite his impairments.  *Jones v.*

25

*Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).  The ALJ may satisfy this burden through the testimony of a VE.  *See id.* at 1229.  For a VE's testimony to constitute substantial evidence, however, the ALJ must pose a hypothetical containing all of the claimant's impairments.  *Id.*  An ALJ is not required to include findings in the hypothetical that properly were rejected as unsupported.  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004).

The ALJ was not required to include a fine-manipulation limitation in the hypothetical to the VE, because substantial evidence supports the ALJ's conclusion Pennington's purported symptoms and limitations concerning his hands were not supported by the medical evidence.  *See id.*  Consequently, the ALJ's hypothetical was proper, and the VE's testimony constitutes substantial evidence Pennington is capable of performing jobs in the national economy despite his impairments. *Crawford*, 363 F.3d at 1161; *Jones*, 190 F.3d at 1229.  Even if the ALJ had erred in failing to include a fine-manipulation limitation in her hypothetical, the error would have been harmless.  In response to questioning by Pennington's counsel, the VE testified Pennington would still be able to perform the ticket-taker job even with a fine-manipulation limitation.

**AFFIRMED.**

26